Bertram Harnett, J.
The Baldwin Faculty Association, bargaining agent for the Baldwin public school teachers, comes to us with a surprising proposition. It had a labor agreement with the Baldwin School Board which, by its terms, was to last at least until June 30, 1973, but which would continue on from year to year unless terminated by either side. The association chose to terminate the agreement effective June 30, 1973. Now, while negotiating with the school board for a new contract, the association, in effect, argues that because the State’s Taylor Law forbids public employees from striking, the terms and conditions of the old contract which it terminated remain in full force and effect until the new contract is reached. We cannot agree.
While on the particular facts of the case we believe this decision to be perfectly apparent, the far-reaching public implications of the association’s position suggest the desirability of the definitive legal statement which follows.
A. THE SETTING-A CONTROVERSY OVER SABBATICAL LEAVES
The case specifically involves claims for sabbatical leave for only five teachers.
On December 5, 1972, a collective bargaining contract was signed by the association and the school board. It was terminated by the association effective June 30, 1973.
Article XI of the contract, entitled “ Sabbatical Leave” provides in pertinent part:
“ A. Sabbatical leave will be granted for purposes of Board-approved programs of study. * * *
“ B. No more than 12 sabbatical leaves during any one school year will be approved by the Board. Of these 12 leaves, no more than six (6) shall be for a single semester at full pay. * * * Fourteen (14) years of-continuous service in the District shall be required in order to be eligible for said leave.
“ O. There will be no sabbatical leaves granted for the Fall Term of 1972-73, except as necessitated by emergency health conditions. For the purpose of avoiding divesture by action of the State Legislature taken after the execution date of this Agreement, it is agreed that to the extent permitted by law, sabbatical leaves for the 1973-74 school year are deemed vested *212 as of the execution date of this Agreement although such leaves have not been approved and will not be enjoyed until 1973-74.”
Five teachers applied in the 1972-73 school year for sabbaticals which they hoped to have in the next year, 1973-74. The school board has not acted upon those applications, insisting that the contract has expired and therefore does not, as such, affect 1973-74. The school board argues that the contract became effective retroactively on July 1, 1972, that it was in effect only during the 1972-73 school year, and that it was terminated by the association pursuant to its rights under a termination clause, effective June 30, 1973.
The termination clause, article XXVI (A) reads: ‘ ‘ Unless otherwise specified in this contract, this Agreement shall become effective July 1, 1972 and shall remain in full force and effect to and including June 30, 1973, and shall be automatically renewed thereafter for periods of one (1) year unless either party notifies the other in writing, by certified mail, at least 170 days prior to June 30, 1973, or any subsequent annual anniversary date, of its desire to make changes herein or to terminate this Agreement”.
The teachers seek a judgment in this article 78 proceeding declaring their contractual right to be granted sabbatical leaves under the expired agreement.
B. THE ARTICLE 78 PROCEEDING IS APPROPRIATE
Actually, the school board prefaces its own argument by denying that an article 78 proceeding is an appropriate vehicle for achieving the relief sought by the association. It contends the petition smacks of contract violation and the suit should strictly be for breach of contract.
However, this misses the point that, if the school board violated the contract, in so doing, it “ failed to perform a duty enjoined upon it by law ”. (CPLR 7803, subd. 1.) These disputes between teachers and school boards are classic subjects for article 78 relief (see Matter of Gimprich v. Board of Educ. of City of N. Y., 306 N. Y. 401; Matter of Schwartz v. Bogen, 28 A D 2d 692, mod. on Other grounds, 21 N Y 2d 1020), even to the extent of seeking a declaration of respective parties ’' rights. (Matter of Gold v. Lomenzo, 29 N Y 2d 468; Board of Educ. of Cent. High School Dist. No. 2 of Towns of Hempstead and North Hempstead v. Allen, 25 A D 2d 659.)
The administrative remedy suggested by the school board, an appeal to the Commissioner of the New York State Depart *213 ment of Education pursuant to section 310 of the Education Law, is not an exclusive remedial procedure. It does not bar the present application for judicial relief. (Lorenz v. Board of Educ. of Union Free School Dist. No. 9, Town of Greenburgh, 264 N. Y. 591; Matter of Garber v. Board of Educ. of City of N. Y., 50 Misc 2d 711.)
In any event, technicality is not a favored instrument in these modern days. (Cf. Matter of Borders v. Nassau County Dept. of Social Servs., 34 A D 2d 805.) Witness subdivision (c) of CPLR 103 where it is provided that once jurisdiction is obtained over the parties, a civil judicial proceeding shall not be dismissed because it was not brought in the proper form.
Accordingly, the school board’s first, second, third and fourth affirmative defenses must be denied.
C. IMPACT OF CONTRACT PROVISIONS
The collective bargaining contract offers the key departure point in grasping the legal relationships of the parties.
1. OPERATION OF THE TERMINATION CLAUSE
As article XXV"! (A), the termination clause, reads, the agreement continues to run after June 30, 1973 in successively renewed one-year periods, unless either contracting party notifies the other of its contrary intention. And, the attorneys for both parties fully acknowledged in open court that the association did in fact give the requisite notice to terminate after fhe one year. Unequivocally, this agreement expired on June 30, 1973. Indeed, it was indicated that both parties have been and are now engaged in serious collective bargaining negotiations in order to reach a new school year contract for the impending school year.
2. SABBATICAL ENTITLEMENT LIVES OR DIES WITH THE CONTRACT
The association must now, despite its own termination of the contract, argue that the board obligated itself in the year 1972- 73 agreement to grant sabbaticals for the following year 1973- 74. The determinant here, again, is the written instrument and the court finds no language which commits the school board to approving, or being bound to grant in advance, sabbatical leaves to take place in the year after the contract has expired.
The sabbatical leave provisions in article XI do not purport to bind the school board beyond the contract period. Though, the committee which was established to make sabbatical “ deter- *214 ruinations ” prior to any submission for school board approval, did recommend sabbaticals for people involved here, the contract specifically states that ‘ ‘ This committee may not go beyond this Agreement
In sum then, while a sabbatical right can be conferred or vested by either contractual provision or board action (Matter of Board of Educ. Cent. High School Dist. No. 3, Nassau County [Teachers Assn., Cent. High School Dist. No. 3], 40 A D 2d 716; Matter of Streb v. Board of Educ. of Union Free School Dist. No. 1, 42 A D 2d 598), here no such “ right ” has in fact been conferred or vested by contract or by school board action. The contract specifically negated sabbaticals for the fall term -1972-73 and was then canceled by the association before another year came around.
There can be no doubt that the parties understood that sabbaticals were contingent upon there being an effective contract in the year when leaves were to be taken. The fact-finder, appointed as a result of the impasse in collective bargaining negotiations in May, 1972, submitted his report on August 12, 1972 stating that sabbatical leaves for 1973-74 be. vested “ unless this recommendation be modified in future collective negotiations ”. And, the Superintendent’s memorandum to the professional staff dated October 6, 1972 announced: “ The Fact-Finder has advised this [vesting of sabbatical leaves for 1973-74] does not refer to .a carry-over of 1972-73 leaves, but provides assurance that sabbatical leaves will be made available for 1973-74 regardless of any State legislation which could prohibit the granting of new leaves effective 1973-74, unless the item is not included in a newly negotiated contract for that year”. (Emphasis .supplied.)
Nor is the argument persuasive that because as a practical matter people must prepare well in advance for their sabbaticals, the old contract as a one-year contract must entail a carryover of sabbatical rights to 1973-74. This was not simply a one-year contract; this was a contract-with an initial one-year term, subject to automatic renewal unless' either party affirmatively elected to terminate. If the association had not chosen to terminate as part of its negotiating posture in deriving a new or modified collective bargaining agreement, the parties would by now doubtless have had their sabbatical opportunities, preparation and all.
So much of article XI-C which deals with an anticipatory evasion of State legislation carries the ambiguity and frailty implicit in that type of enterprise. The court believes article *215 XI-C means there will he no sabbaticals in the fall of 1972-73, and, if the contract continues into later years under the automatic renewal, the date of grant of any sabbaticals granted in' those later years is to be brought back to the original contract execution date. . This represents an effort to circumvent a potential sabbatical moratorium and to take advantage of those cases (e.g., Matter of Board of Educ. of Cent. High School Dist. No. 3 [Teachers’ Assn., Cent. High School Dist. No. 5], 40 A D 2d 716, supra; Legislative Conference of City Univ. of N. Y. v. Board of Higher Educ. of City of N. Y., 67 Misc 2d 648, mod. on other grounds, 38 A D 2d 524; Matter of Ewen v. Board of Educ. of Union Free School Dist. No. 18 of Plainedge, 67 Misc 2d 555, affd. 39 A D 2d 605) which held that, notwithstanding the 1971-72 New York State Legislature’s ban on sabbatical leaves (L. 1971, ch. 124, § 1 [eff. April 12, 1971]), teachers who had previously vested sabbaticals could keep them. But, that result must always depend on the existence of a vested right to the sabbatical leaves in the first place.
There is no issue here of the board rescinding sabbaticals already granted, as no action has been taken, either approving or denying the applications. (Cf. Runestad v. Board of Educ. of East Williston Public Schools, Feb. 1, 1972 [Suozzi, J., Index No. 535/72, Sup. Ct., Nassau County].)
3. CONCLUSION
The conclusion that emerges is that sabbatical leaves in a current year are dependent upon rights conferred in a contract. (Matter of Messano v. Board of Educ. of Union Free School Dist. No. 23, Massapequa, 39 A D 2d 579; Matter of Frank v. Board of Educ. of Union Free School Dist. No. 11, Oceanside, 71 Misc 2d 318.) This is reinforced by the fact that the 1972-73 contract, signed in December, 1972, eliminated any sabbaticals for the fall of 1972-73, notwithstanding any prior contract. Here, the board never approved the sabbatical applications, and, after June 30, 1973, is under no obligation to do so, at least until a new contract is negotiated which provides for sabbaticals in the desired periods.
D. THE TAYLOR LAW DOES NOT CONTINUE UNION-TERMINATED CONTRACTS DURING NEW COLLECTIVE; BARGAINING NEGOTIATIONS
The association then argues that even if the contract were over, it was still entitled to the benefit of all its terms, including the sabbaticals; in effect a preservation of the status quo, *216 by virtue of its construction of the Taylor Law. It claims that, since it cannot strike, the status quo must be maintained. Discomforting for the association must be the realization that nowhere on the face of the Taylor Law is there any direct support for its proposition.
Accordingly, the association falls back on an administrative decision of the State Public Employees Relations Board (PERB) cited as Matter of Triborough Bridge & Tunnel Auth. (Case No. U-0362, April 24, 1972) and the short form order in Matter of Board of Educ. of Connetquot Cent. School Dist. No. 7 (Sup. Ct., Suffolk County, Aug. 14, 1972, Geiler, J.). Although there was no reference to the Taylor Law point in the papers submitted before oral argument, and the association proceeded there only on the breach of contract theory, the court.granted petitioners’ request to present copies of the decisions by way of supplemental letter dated August 7, 1973 on notice to the school board. Because of the importance of the Taylor Law considerations raised, the court has determined to. consider them fully. They do not affect the result here.
We observe first that this is not a case of continuing grievance procedures past the contract expiration date in order to resolve substantive disputes arising during the contract period. (See Matter of Board of Educ. of Connetquot Cent. School Dist. No. 7, supra.) Here, at issue is the continuation of a substantive employment benefit where there is neither a contract nor statute authorizing its continuation.
In Matter of Triborough Bridge & Tunnel Auth. (supra), the contract had expired and the school attempted to halt salary increments while a new contract was being negotiated. The PERB hearing officer found that changes in “ mandatory subjects of negotiation during the hiatus between an expired contract and the conclusion of negotiations for a successor contract ” constitute an improper employer practice under the Taylor Law (Civil Service Law, § 209-a, subd. 1). He specifically denied that the case rested upon any ‘ ‘ strict contract law that the terms of the expired contract are binding upon the employer until a new contract is executed ”, yet held that the salary increments could not be discontinued, opining that “ a collective agreement establishes ‘ the law of the shop ’ which binds the parties until their mutual changes are agreed upon
Section 209-a of the Civil Service Law divides ‘ ‘ improper employer ” practices into four categories. The first three concern interference with employee formation of or participation *217 in employee organizations and are not remotely related to this case. (See Matter of City of Albany v. Helsby, 36 A D 2d 348, mod. on other grounds, 29 N Y 2d 433.) The fourth is, “ deliberately * * * to refuse to negotiate in good faith with the duly recognized or certified representatives of its [the employer’s] public employees ”. (Civil Service Law, § 209-a, subd. 1, par. [d].) Most directly, this last provision concerns a public employer’s conduct in and during negotiations, and, in particular, its refusing to negotiate an appropriate term of working conditions. (See Matter of Farrigan v. Helsby, 68 Misc 2d 952.)
The apparent PERB rationale for so extending the statutory definition of “ improper employer practice” is that employer conduct towards its employees during negotiations but outside the four walls of the negotiation hall may be so prejudicial and threatening as to have á direct effect on negotiations, amounting then 'to a deliberate refusal to negotiate in good faith.
The PERB administrative decision in Matter of Triborough Bridge & Tunnel Auth. (supra) while not by a court of law, is entitled to respect because of the experience and dedication of that body in this field. However, it is fair to note that this administrative decision has not been adopted or confirmed by any appellate court, and, of course, is not strictly binding on this court. However, even if it were to be correct (and in this respect the court could not form an opinion based on the paucity of facts in the hearing officer’s cited decision), the situation differs markedly from the one in Baldwin. Here, the association has neither alleged, proven, nor addressed itself to any “ improper employer practices ”. Were such a claim made, there is no indication that sabbatical leaves for no more than 12 teachers of 14 years’ seniority in a large Nassau County School District are “ mandatory subjects of negotiation ”. For whatever the term “ mandatory subject of negotiation ” means, theré must be a difference between basic salary for all the teachers in a large school district and possible board approval of study program sabbaticals for only 12 of them. Indeed the prior contract cut out sabbaticals entirely for the 1972-73 fall term, which is some indication that the leaves were not “ mandatory ”. The allegation of improper labor practice is seriou^, and involves elements of good faith. j There is absolutely no proof in this record that the board’s failure to act on pending sabbatical applications constitutes an improper employer practice.
*218 Conceivably there may be circumstances in the field of public employment where during the inter-contract period an employer’s abrupt curtailment of employee benefits customarily enjoyed would be so drastic as to influence or undermine materially and deliberately the pending collective bargaining process.
Employer-tampering with certain basic employee benefits during negotiations may well be so barren of other explanation as to imply an overt attempt to pressure the employee representative in the on-going talks. Drastic wage cutbacks or enlargement of working hours may be possible examples. These concern items almost taken for granted such as reasonable wage levels. Such conduct might under appropriately established circumstances constitute an unfair labor practice. But even these may be legitimately occasioned by factors other than intent to pressure teachers, as by budget or facility cutbacks. Accordingly, where such major' interim changes occur, the issue still requires close examination of employment circumstances: Here, however, sabbaticals are clearly not mandatorily accorded every year. They are not indispensable to a contract nor taken for granted in the absence of contract provision. They may be allowed by contract in 1973-74 or they may be wholly denied as happened in the fall of 1972.
E. COURTS SHOULD HOT LIGHTLY TIP HEGOTIATIHG BALAHCE
Preservation of the status quo after a labor contract has been terminated by a union, however worthy a goal may be the protection of public employees, cannot mean with any fairness that all the prior contract terms are carried forward into the new negotiating period. The employees then would always start where they previously left off. They would be locked into a guaranteed gain position, and the employers into an assured losing stance. In the language of negotiators the country over, the union would have no place to go but up. Yet, there is no indication in the statute or the contract that this result was intended. Indeed, the contract reference to and association option for “ termination ” indicates that the parties were negotiating from scratch.
The limitation on strike ability for public, employees (unlike private employees) does handicap them in negotiations, although proponents point with substance to differing policy bases to public and private employment. However, it is not for the courts to add employer handicaps, particularly where these tamper with the essence of collective bargaining. The Taylor Law, section 200 et seq. of the Civil Service Law, places great *219 emphasis on collective bargaining in public employment, and in this sénse, the terms of the negotiated contract are critical. Changes in the power balance are only to be accorded by the Legislature and even then in carefully measured amounts.
Accordingly, the application is denied and the petition dismissed.